IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                Plaintiff

v.

GERARDO PINEDA SORIA,

                Defendant.

REPORT AND
RECOMMENDATION

08-cr-105-bbc-02
_____

REPORT

Defendant Gerardo Pineda Soria has moved to suppress physical evidence seized from his apartment and statements he made following his arrest on June 19, 2008 when a drug task force entered his residence, ostensibly pursuant to a search warrant. *See* dkt. 85.[1] For reasons stated below, I am recommending that the court completely deny the motion to suppress.

On December 5, 2008, this court held an evidentiary hearing on the motion to suppress. Having heard and seen the witnesses testify, having considered the affidavits and other exhibits, and having made credibility determinations, I find the following facts:

**Facts**

On Wednesday, June 18, 2008, DEA Special Agent Yvonne Jarosz sought and obtained from this court a search warrant for 253 South High Street, Apt. A, in Janesville, Wisconsin. In her supporting affidavit, Agent Jarosz reported that the building housing this apartment was a Victorian home subdivided into apartments, two at the 253 South High Street address, and two more with an address of 321 West Holmes Street. The entry door to the 253 South High Street

---

[1] Pineda also seeks a bill of particulars setting forth four sets of facts. *See* Dkt. 83. I will be issuing a separate order on this motion.

address opened into a two-story foyer that contained the door into Apartment A on the first floor and an open, steep staircase leading to a second-story landing and the door into Apartment B. Neither apartment actually was marked with a letter. The agents developed persuasive evidence that Gerardo Pineda Soria was trafficking cocaine from his residence at 253 South High Street. Residents of the downstairs apartment told agents (during a ruse interview) that the upstairs apartment was empty. From this, the agents assumed that Pineda must live in the downstairs apartment with the other tenants. Based on this assumption, the agents limited their warrant application to Apartment A.

At the time the court issued the search warrant for Apartment A it also signed a criminal complaint and issued an arrest warrant for Gerardo Pineda Soria on drug charges.

At 6:01 a.m. the next morning, June 19, 2008, the DEA, assisted by officers from the Janesville Police Department (JPD) and a JPD tactical team, entered 253 High Street to execute the warrant. Agent Jarosz was not present on the scene and no one had advised the entry team or the police officers that the warrant was limited to Apartment A. As a result, the entry team not only entered Apartment A on the first floor, but ascended the staircase and entered Apartment B through the open hallway door. The entry team saw no indications that the upstairs unit was a separate apartment. While performing their preliminary sweep, the entry team found three men sleeping: Gerardo Pineda Soria, Hoguer Pineda and Adrian Lazcano. All three men were taken downstairs into the living room of Apartment A, in which approximately ten residents also were found. Pineda Soria was arrested on the federal warrant.

DEA agents and JPD officers had begun searching both upstairs and downstairs at 253 High Street, using a drug-sniffing dog. Within minutes, and before anyone had discovered

anything of evidentiary value, DEA Special Agent Craig Grywalski learned from one of the downstairs residents that the building was subdivided into several apartments. As a result of this, JPD Sergeant Steve DeWitt ordered the searching officers to withdraw while the lead agents determined what to do. The search team waited on the lawn for further instructions from those in charge.

DEA Special Agent Jerome Becka and JPD Officer Denise Stutika were about to take Pineda to the police station to attempt an interview; Agent Becka advised Agent Grywalski that they would ask Pineda Soria for consent to search. Agent Grywalski also called the AUSA who was overseeing this case to explore the possibility of obtaining another search warrant for the upstairs apartment.

Shortly after Pineda Soria was removed, Sergeant DeWitt directed Spanish-speaking Officer Shawn Welte to seek consent to search from Hoguer Pineda, age 19, and Adrian Lazcano, age 26, the two other residents of Apartment B who still were on the scene, sitting with the residents of Apartment A. Neither man was handcuffed, and both had been allowed to dress. At about 6:45 a.m. Officer Welte asked each man separately, in Spanish, if he would consent to a search of his apartment, advising each of them that he didn't have to do so. Each man orally consented to the search. Sergeant DeWitt wanted to back this up with written consent, so at the 7:00 a.m. shift change he called the station and directed Spanish-speaking Officer Chad Sullivan to bring a written consent form with him to translate into Spanish for Hoguer Pineda and Lazcano.

By then, Agent Becka and Officer Stutika had transported Pineda Soria to the station, advised him of his rights, and sought his cooperation. Officer Stutika translated; DEA agent Sergio Ceren joined part of the conversation *via* speaker phone to assist Officer Stutika and to

ensure that Pineda Soria knew what he was doing. Pineda Soria waived his *Miranda* rights and signed the waiver form. Pineda Soria then consented to a search of Apartment B and signed the consent form. It was 7:08 a.m. The agents had not shown Pineda Soria any photographs from their investigation and they had not told him that his brother already had consented (because he hadn't, at least not yet).[2] Agent Becka immediately communicated Pineda Soria's consent to Agent Grywalski. At this time, no one had yet found any contraband at the residence, nor had anyone told Pineda Soria that they had found contraband.

It is not clear whether officers recommenced their search immediately after obtaining oral consent from Hoguer Pineda and Lazcano, or whether they learned before starting that Pineda Soria also had consented, but they did start before his two co-tenants had signed the written consent form. Apparently while the search was occurring, Officer Sullivan handwrote a Spanish translation of the English language consent to search form, presented it to Pineda and Lazcano and confirmed with them that they voluntarily had consented to the search. At 7:40 a.m., both men signed the form, commemorating in writing their earlier oral consent to the search of Apartment B.

During the second search, officers found evidence of drug trafficking, including about a kilogram of powder cocaine under Pineda Soria's bed in Apartment B.

Apparently, no one passed this news along to Agent Becka and Officer Stutika, whose interview with Pineda Soria was going nowhere as he continued to deny involvement in cocaine trafficking. The agents decided to call it a day and to transport Pineda Soria up to federal court

---

[2] Pineda Soria contends otherwise in his affidavit supporting his motion to suppress. Pineda Soria is incorrect. Because Pineda Soria did not testify at the hearing, I do not have enough information to determine whether his misstatement of material facts is willful.

in Madison. On the way, they stopped at 253 High Street to check the progress of the search. When they got there, Agent Grywalski reported recovery of the cocaine from beneath Pineda Soria's bed. Using Officer Stutika as his interpreter, Agent Becka shared this information with Pineda Soria, reminded him that he still was protected by his *Miranda* rights, then asked him if he was willing to take another stab at cooperating. Pineda Soria agreed, and provided self-incriminating statements. The trio returned to the police department to continue the interrogation. When Soria equivocated about his role in events known to the agents, they showed him surveillance photographs that undermined his denials.

ANALYSIS

Pointing to the illegal initial entry into Apartment B, Pineda Soria seeks to suppress all of his subsequent statements to the agents and all physical evidence seized from the apartment. As part of this, Soria argues that his subsequent consent to search was not voluntary. His only response to the third-party consent provided by Hoguer Pineda and Lazcano is that the officers' testimony on this issue was incorrect.

As a starting point, let's apply the Supreme Court's recent decision in *Herring v. United States* (Jan. 14, 2009). Here's the new rule on suppression:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring*, 2009 WL 77886 at *7.

Duly noted. The court cannot fault the JPD entry team or JPD searchers for mistakenly entering Apartment B because nobody told them that the warrant was limited to Apartment A on the first floor; further, there was no indication that morning that the upstairs actually was a separate residence.

But the court *can* fault the DEA, because at least some of its agents–but not those actually present on the scene–knew that there were two apartments at 253 High Street and that the search warrant was limited to the first floor apartment. Under the collective knowledge doctrine, the limits of a warrant must be imputed to those who searched in reliance on it. *See United States v. Whitaker*, 546 F.3d 902, 905 (7th Cir. 2008). The DEA's failure properly to educate and supervise its search team to prevent unwarranted entry into a separate residence constitutes gross negligence, if not recklessness. Accordingly, *Herring*'s narrowing of the exclusionary rule cannot help the government in this case.

Even so, Pineda Soria cannot obtain suppression of the physical evidence seized from Apartment B. The initial illegal entry did not lead to the discovery or seizure of any physical evidence. Application of the exclusionary rule must bear some relation to the purposes that the rule is to serve. *United States v. Villegas*, 495 F.3d 761, 769 (7th Cir. 2007). Therefore, exclusion is unjustified when the alleged error is not in the causal chain leading to the challenged evidence. *United States v. Mikos*, 539 F.3d 706, 710 (7th Cir. 2008) (*citing Hudson v. Michigan*, 547 U.S. 586 (2006). Here, the police withdrew from Apartment B upon learning that the warrant did not include it. They did not recommence their search until they had consent from the apartment occupants to do so, and that's when they discovered the kilo of cocaine and other evidence.

The question becomes whether the re-entry was reasonable. It was: Pineda Soria's two flatmates both consented to the search. Not so fast, argues Pineda Soria: but for the first, illegal entry, the police never would have encountered his flatmates to obtain their permission to *re*-enter. This claim has traction for Pineda Soria personally, as discussed below, but Pineda Soria cannot complain about any violation of his co-tenants' Fourth Amendment rights because these are personal rights that may not be asserted vicariously. *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007).$^3$

So, the court may consider whether the flatmates' consent to search Apartment B sufficed to authorize the warrantless search. The government must prove by a preponderance of the evidence that this consent was freely and voluntarily given. Whether consent is voluntary is a question of fact, dependent upon the totality of the circumstances. Relevant factors include the consentors' ages, intelligence and education; whether they were advised of their right to refuse; whether they had been detained before giving consent; whether consent was immediate or was prompted by repeated requests by the authorities; and whether any physical coercion was used. *See, e.g., United States v. Figueroa-Espana*, 511 F.3d 696, 705 (7th Cir. 2007); *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006).

We do not know much about Hoguer Pineda or Lazcano. They were both relatively young men. Their interaction with Officer Sullivan established that they could read and understand

---

$^3$ The government also argues that the entry team would have been authorized to enter Apartment B to perform a protective sweep pursuant to *Maryland v. Buie*, 494 U.S. 325 (1990), but *Buie* limits the protective sweep to the residence for which the warrant was issued, *id.* at 332-33. Police cannot sweep every apartment in a multi-unit building just because there is a common foyer and the doors happen to be open.

written Spanish. They were rousted from their sleep by armed officers, removed from their apartment and herded into the living room of Apartment A, acts not conducive to voluntariness. But they were allowed to dress, they were in the company of other people they knew, and no one approached them to ask for consent until about 40 minutes after they first were confronted. Officer Welte, alone, asked each man for consent and explained the right to refuse. Both men consented. About half an hour later, Officer Sullivan corroborated this with a written consent form. By signing the form, each man verified that he knew he could refuse consent to search, but voluntarily was consenting without any threats or promises. Absent any contrary evidence, this is sufficient to prove that the officers obtained voluntary consent to search Apartment B before they re-entered and discovered contraband.

As a result, it is irrelevant whether Pineda Soria voluntarily consented to the search, but for completeness's sake, I find that he did, as evidenced by his signed consent form and Agent Becka's testimony as to how consent was obtained. Pineda Soria's affidavit claiming otherwise is not believable because in it Pineda Soria has re-sequenced events in order to optimize the support for his claim of involuntariness. As noted above, I cannot say whether Pineda Soria intentionally presented an incorrect version of events or if he now actually recalls things happening as he states, but in any event, he got it wrong. His consent to search was voluntary.

But Pineda Soria still has a valid point about his presence at the police station:

> A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless the confession is attenuated enough from the illegal arrest that the confession is sufficiently an act of free will to purge the primary taint.

*United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003).[4]

There is no conceptual reason to distinguish confessions from consents to search, and I will address this issue below when analyzing whether to suppress some or all of Pineda Soria's post arrest statements. At least with regard to Pineda Soria's consent to search, the answer doesn't matter because the consent provided by Pineda Soria's flatmates sufficed to authorize the search.

Finally, the government argues the inevitable discovery doctrine salvages this search because agents could have and would have obtained a search warrant for Apartment B. *See United States v. Tejada*, 524 F.3d 809, 812-13 (7th Cir. 2008). Indeed, Agent Grywalski was on the phone with the Assistant U.S. Attorney discussing this possibility while others were seeking consent to search. Pineda dismisses this argument as bootstrapping: any new warrant for Apartment B would have to have been based on evidence discovered during the illegal first entry.

That's one possibility, but there are others. After excluding any evidence actually obtained from Apartment B during first entry (namely, Pineda Soria's presence), what remains is the evidence that Pineda Soria did *not* live in Apartment A as the agents had assumed when they requested their search warrant. The only reason the agents specified Apartment A in their warrant application was because they thought that this was the unit in this building in which Pineda Soria lived. Upon deducing through the process of elimination that he actually lived in Apartment B, the agents could have resubmitted the same affidavit with supplemental information explaining why they now surmised that Pineda Soria lived in Apartment B. This would have been sufficient for this court to issue the new warrant. Pursuant to *Segura v. United States*, 468 U.S. 796 (1984),

---

[4] **That said,** Pineda Soria cannot challenge–and is not challenging–his actual presence before this court. *See United States v. Crews*, 445 U.S. 463, 474 (1980).

the agents could have entered Apartment B and secured it to prevent the destruction of evidence while they obtained the new search warrant.

The bottom line is that Pineda Soria is not entitled to suppression of any of the physical evidence seized from Apartment B.

Circling back to *Reed's* holding regarding confessions following illegal arrests, I conclude that this court should not suppress any of Pineda Soria's statements to agents made during his first interview or his second interview. In determining admissibility of either statement, the threshold requirement is that the confession be voluntary under the Fifth Amendment; if so, then the court must consider the temporal proximity of the illegal conduct to the statements, the presence of any intervening circumstances, and most importantly, the purpose and the flagrancy of the police misconduct. *Reed*, 349 F.3d at 463.

There is no doubt that Pineda Soria answered questions voluntarily. He received a full *Miranda* advisal and waived his rights. The agents made no threats or false promises to induce him to talk. The circumstances of his arrest were problematic, but without diminishing the importance of Pineda Soria's Fourth Amendment rights, from a Fifth Amendment perspective, he was in no worse a predicament than if the agents had specified the correct apartment in the search warrant. Most importantly, Pineda Soria clearly demonstrated his ability to exercise his free will by lying to the agents during both interviews. He repeatedly made provably false denials to the agents, apparently hoping to bluff his way through the interrogations.

Jumping to the last, most important factor in the *Reed* analysis, the Fourth Amendment violation here was neither purposeful nor flagrant. The DEA had obtained the search warrant for

10

the purpose of arresting Pineda Soria in his home and then searching it. Their evidence led them to pick the wrong apartment of two, but this was palpably unintentional, and as noted above, quickly remediable. Part of the remedy, under *Segura*, would have been to secure and hold Apartment B until a new warrant could be obtained. So, although the *search* could not commence until a new warrant (or valid consent) was obtained, *entry* into Apartment B was constitutionally reasonable even in the absence of a warrant. Once inside, the police did have the right to ensure their own safety by conducting a protective sweep. They had a valid arrest warrant for Pineda Soria; upon discovering him in Apartment B, they were not obliged to set him free as penance for having erred and strayed in their warrant application. So, from Pineda Soria's perspective, he was no worse off than if the warrant had been for Apartment B than Apartment A.

Then the agents drove Pineda Soria to a new location and provided him with *Miranda* warnings and started interviewing him within about an hour after first encountering him in his apartment. This is not significant attenuation, but if we temper *Reed* with *Herring*'s admonition that the criminal should not profit unduly from the constable's blunder, it is a fairly safe bet to conclude that Pineda Soria's first statement was sufficiently attenuated from the illegal entry into his apartment so as to avoid exclusion.[5]

If this seems too close for comfort, then the court could suppress Pineda Soria's first interview on the ground that it was not sufficiently attenuated from the entry into Apartment B. But there were significant intervening factors before the second interview that clearly establish

---

[5] Note that the blunder here was picking the wrong apartment for the warrant, not the entry into Apartment B in mistaken reliance on the warrant. As just discussed, there were constitutionally reasonable ways for the agents to have made contact with Pineda Soria that morning without relying on the improper entry into Apartment B.

attenuation: the agents ended the first interview and drove Pineda Soria back to 253 High Street, having no intention at that time to interview him again. At the search scene, the agents, and Pineda Soria, learned that searchers had recovered a kilo of cocaine from under Pineda Soria's bed, decisively and objectively undermining his previous denials to the agents. The agents reminded him that he retained his *Miranda* rights and asked him if he wished to speak further. He responded that he did. These changes in time, location and material circumstance were sufficient to ameliorate the concerns raised in *Reed*. This court should not suppress Pineda Soria's second set of statements to the agents.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court completely deny defendant Gerardo Pineda-Soria's motion to suppress physical evidence and his post-arrest statements.

Entered this 11th day of February, 2009.

> BY THE COURT:
>
> /s/
>
> STEPHEN L. CROCKER
> Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

February 11, 2009

Paul Connell
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

William Jones
Jones Law Firm
P.O. Box 44188
Madison, WI 53744

       Re:   United States v. Gerardo Pineda Soria
              Case No. 08-CR-105-bbc-02

Dear Counsel:

     The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

     The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

     In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before February 23, 2009, by filing a memorandum with the court with a copy to opposing counsel.

     If no memorandum is received by February 23, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                       Sincerely,
                                       /s/
                                       Connie A. Korth
                                       Secretary to Magistrate Judge Crocker

Enclosures
cc:     Honorable Barbara B. Crabb, District Judge

13

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections.  An objecting party shall serve and file a copy

14

of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).