IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                                                  ORDER

            Plaintiff,

                                                  08-cr-105-bbc

    v.

GERARDO PINEDA SORIA,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       In a report and recommendation issued on February 11, 2009, the United States Magistrate Judge recommended denial of defendant Gerardo Pineda Soria's motion to suppress evidence seized from his apartment and statements he made to law enforcement agents. Defendant has filed objections to the report, contending that the magistrate judge erred in making findings of fact and that he reached the wrong legal conclusion.

       The backdrop to defendant's motion to suppress is a June 18, 2000 search executed in Janesville, Wisconsin by agents of the Drug Enforcement Administration. I draw the following description of events from the magistrate judge's report.

       Acting on the belief that defendant was living in Apartment A on the first floor of a building at 253 South High Street and trafficking cocaine from the premises, the agents

1

obtained a search warrant from the magistrate judge for Apartment A, along with a criminal complaint and an arrest warrant for defendant. Together with Janesville police officers, they entered the High Street building at approximately 6:01 am. For unexplained reasons, the entry team that executed the search warrant was unaware that it was limited to Apartment A and also unaware that the rooms on the second floor of the building were a separate apartment (B), although nothing on the door or next to it identified it as such. The team extricated three men from the rooms, one of them was defendant and one was his brother. Shortly thereafter, the team learned of the separate nature of Apartment B and put an end to any search of the apartment while they considered their next move.

In the interim, the agents arrested defendant on the federal warrant and transported him to the Janesville police station sometime between 6:15 and 6:30, leaving his brother and the second roommate in Apartment A with the occupants of that apartment.

At about 6:45, an agent asked the roommates individually and in Spanish whether they would agree to a search of Apartment B. Both gave verbal consent to a search. At about 7:08 am, while in custody at the police station, defendant signed a written waiver of his <u>Miranda</u> rights and a written consent to a search of Apartment B. DEA Agent Jerome Becka called his counterpart, DEA Agent Craig Grywalski, about 7:10 to tell him of defendant's consent. Grywalski resumed the search immediately thereafter. Agents found a kilogram or less of cocaine under defendant's bed, as well as other evidence of drug

trafficking. When this discovery was brought to defendant's attention later, he agreed to cooperate and provided incriminating statements.

OPINION

Defendant objects to the magistrate judge's findings that (1) the testimony of the agents was credible; (2) the initial unconstitutional police presence in Apartment B lasted only a few minutes before the agents called off the search; (3) the agents found no incriminating evidence in the apartment before they obtained consent to search; (4) DEA Agent Becka ever advised Grywalski that Becka would ask defendant for consent to a search; (5) defendant was not informed before he signed his own consent to search that his brother had already given verbal consent to a search; and (6) Janesville Police Officer Chad Sullivan ever confirmed with the two roommates that they had given prior verbal consent to a search.

A. Alleged Factual Inconsistencies and Omissions in Report and Recommendation

1. General credibility of agents

Defendant faults the magistrate judge for not giving any reason for finding the agents' testimony at the evidentiary hearing credible, especially in light of the conflict between the testimony and the written reports prepared by the agents. As one example of conflict, defendant points to the report prepared by "Primary Reporting Officer" Bahr, who stated

3

that no search of Apartment B occurred before all three occupants had signed consent to search forms. Defendant calls this blatantly inaccurate in light of the evidence of a photograph of a seized item taken at about 7:22 am, well before the two roommates signed their consent forms. Defendant adds that three of the agents involved in the search never prepared any reports. Moreover, he says, the Janesville Police Department dog handler, Shaun Mahaffey, made no mention in his report of the critical fact that the search was interrupted when the agents discovered that the warrant did not authorize them to be in Apartment B. On the other hand, defendant says, Bahr did mention this fact, although his report was inaccurate in other respects.

Defendant identifies another purported inconsistency. Agent Becka testified that he talked to Agent Grywalski for about 16 seconds at about 7:10 am, when he called to say that defendant had signed a written consent to search, yet Janesville police officer DeWitt testified that the call lasted about 3 to 4 minutes. Finally, defendant challenges the magistrate judge's dismissal of defendant's affidavit as untruthful without explaining how he reached than conclusion.

Although it might have been helpful had the magistrate judge explained the bases for his credibility determination in more detail, they are apparent from a review of the transcript. Bahr testified that he put things in his report that he had not observed, that he was confused about a number of things, including when the three men signed written

4

consents to search, that he was wrong when he said in his report that the agents did not resume their search of the upstairs until after all three men had given *written* consent and that he did not know when he prepared his report that defendant's two roommates had given verbal consent earlier. He admitted having undertaken no interviews of anyone before preparing his report and that he was not aware that the entry team had gone into the wrong apartment. Given these admissions by Bahr, the magistrate judge had no reason to give any credence to his report.

As to the argument that three of the participating agents prepared no reports of their own, this is a non-issue. It is not usual for every member of a search team to make out a separate report.

Mahaffey's failure to mention the interruption of the search in his report is not particularly significant. Certainly, it was not sufficient to put into question the credibility of his testimony and the testimony of all the agent-witnesses at the evidentiary hearing on that point.

The difference in perceptions of the length of the 7:10 telephone call between Becka and Grywalski is not the sort of discrepancy that throws the accuracy of the testimony into question. The phone records showed that the call lasted 16 seconds; Officer DeWitt thought it lasted 3-4 minutes, but he admitted that he did not know when it began. Given the circumstances at the time and everyone's desire to resume the search, it is unlikely that

5

DeWitt's estimate of the length of the phone call was accurate.

This leaves only the magistrate judge's failure to say exactly why he found defendant's affidavit incredible. Ordinarily, an affidavit would have no weight in an evidentiary hearing. It is an out-of-court statement that has not been subjected to cross examination. However, the magistrate judge did take it into consideration, R&R, dkt. #170, at 4, 8, and he stated that he found it incredible because defendant "re-sequenced events in order to optimize the support for his claim of involuntariness." Id. at 8. This is a fair summation of the affidavit.

2. The length of the initial police presence in Apartment B

Defendant objects to the magistrate judge's finding that the police stayed only minutes in Apartment B. He points out that they stayed long enough to jimmy the bedroom door in the apartment to get to him. In addition, he relies on the affidavit of a tenant in Apartment B, Mrs. Ochoa and the testimony of Officer (and dog handler) Shaun Mahaffey. Ochoa averred in her affidavit that after she opened the door to the search team, she was held in the living room of Apartment A for about 20 minutes and during that entire time, she heard officers running up and down the stairs to Apartment B and other sounds that seemed to her to be furniture moving and drawers being opened and closed. Ochoa was not called as a witness at the hearing, so her observations could not be subjected to cross examination. It is hardly surprising that the magistrate judge gave no weight to her

6

observations.

According to defendant, Officer Mahaffey is important because he testified that a search was still in progress when he arrived at the High Street building at 6:30. In fact, Mahaffey testified that he arrived just as the building was secured and that he entered with his dog before 6:10. The government does not deny that the building was still being searched at this time. Mahaffey also testified that the search was called off just as he started into the first room of Apartment B and before his dog had alerted on anything in the apartment.

Even if Ochoa's affidavit or Mahaffey's testimony undercut the finding that the first search was limited in nature and that it was called off once the agents realized the limitations of their authority under the search warrant, defendant would not prevail on his objections to the search. As the magistrate judge explained, the doctrine of inevitable discovery saves the search. Had defendant and his roommates refused to give consent to the search, the agents would have had to obtain a new search warrant for Apartment B. This would not have been difficult. Their first application provided probable cause for arresting defendant's living quarters and searching them for evidence of drug distribution. The only error was in identifying the exact apartment in which he was living.

3. <u>Incriminating evidence in Apartment B</u>

7

Defendant argues that the magistrate judge erred in finding that consent to search was obtained from defendant and his roommates before 7:40 am and therefore concluded incorrectly that no evidence was discovered before consent was obtained. He contends that the roommates did not given valid oral consents to search at about 6:45, as the magistrate judge found, and that defendant never gave a valid consent, written or verbal, at about 7:09. Had the roommates given valid oral consents to search, he asks, why was it necessary to bring in Spanish-speaking officers to obtain written consents from the men? How certain could the officers be of the men's understanding of what they agreed to if they had to re-do the consents? Why did no agent record the time the oral consents were given? As for defendant, why is there no time shown on the consent he allegedly signed at the police station?

The magistrate judge did not say explicitly why he found that no incriminating evidence had been discovered before 7:10, which was when the agents received word that defendant had executed a consent to search. R&R, dkt. #170, at 4. Clearly, he believed the testimony from the agents that this was when defendant signed the written consent to search.

4. <u>Grywalski's knowledge of Becka's intent to obtain defendant's consent to a search</u>

As I understand this argument, it is that Becka never told Grywalski he was going to

8

try to obtain defendant's consent to search once he had booked him at the police station. Had he done so, defendant argues, someone would have noted it in a report. Supposedly, the omission of this notation in the report shows that the search was never really called off and is supported by Mahaffey's alleged testimony that when he arrived at the building at 6:30, the search was still ongoing. As I have explained, Mahaffey's testimony was that he arrived within minutes of the 6:01 entry, not a half-hour later. As for the omission of Becka's statement from the report, it is not unusual for such a report to omit something that transpired during a chaotic, fast-moving event, no matter how important the omitted act may be in retrospect. The omission does not make Mahaffey's testimony suspect.

5. <u>Defendant's knowledge of his brother's consent to search</u>

Defendant points out that the magistrate judge found on page 4 of the report and recommendation that the reason the agents did not tell defendant before he signed the consent to search at 7:08 that his brother had previously consented to a search was because his brother had not done so yet. Noting that this finding is inconsistent from the magistrate judge's previous finding that the roommates had given verbal consents at 6:45, defendant concludes that defendant did not give his written consent until after 7:40, which was when the roommates signed their consent forms. I am persuaded that the magistrate judge erred when he said that defendant's brother did not give his consent before 7:08 and that this

9

error does not affect his recommendation.

6. <u>Confirmation of roommates' previous verbal consent to search</u>

Defendant takes issues with the magistrate judge's finding that Janesville Police Officer Chad Sullivan confirmed with the two roommates "that they voluntarily had consented to a search," R&R, dkt. #170, at 9, to the extent that the finding suggests that Sullivan had confirmed with them they had given knowing verbal consents. It is clear from Sullivan's testimony that he never asked the men any questions about their prior statements. I do not read the report and recommendation as suggesting that he had.

## B. <u>Alleged Errors of Law</u>

Defendant contends that the magistrate judge erred in concluding that the initial illegal entry did not lead to the discovery or seizure of any physical evidence, but he does not identify what that evidence might be. I am not persuaded that the magistrate judge erred in finding that the initial search found no evidence of drug possession and distribution.

Defendant contends that it is error to believe that the search is covered by the inevitable discovery doctrine. He argues that if this is true, the result would be that the police could undertake a fishing expedition through an apartment complex, obtaining a warrant for one apartment in a complex; and coming right back for another one if the first apartment turns out to be wrong one, until they have searched the entire complex. This is

not a likely scenario in general or an apt one in this case. In order to obtain a warrant in the first place, an applicant must show that probable cause exists to believe that the suspect is living in the residence or that evidence of criminal activity can be located there. In this case, when the agents sought their search warrant, they had done sufficient investigation to give them probable cause to believe that Apartment B was unoccupied and that defendant was living in Apartment A.

Defendant challenges the finding that his arrest was legal, arguing that the existence of an arrest warrant did not authorize the entry into Apartment B and that the taint of this illegal arrest invalidates his subsequent confession. The magistrate explained persuasively why he found the confession voluntary and untainted by the previous search.

The magistrate judge covered defendant's remaining objections in his report and recommendation. He explained why the roommates' consent was voluntary, why any voluntariness questions related to defendant's consent to search were rendered irrelevant to the consent provided by his roommates and why the initial entry into apartment B was not unconstitutional. It is not necessary to go over these objections in any additional detail.

## ORDER

IT IS ORDERED that the report and recommendation issued by the magistrate judge on February 11, 2009, is ADOPTED as the court's own. FURTHER, IT IS ORDERED that

11

defendant Gerardo Pineda Soria's motion to suppress evidence obtained during the June 18, 2008 search of Apartment B, 253 High Street, Janesville, Wisconsin, and the statements he made following his June 18, 2008 arrest is DENIED.

Entered this 5th day of March, 2009.

                              BY THE COURT:
                              /s/
                              BARBARA B. CRABB
                              District Judge